**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

SARI NELSON,

     Claimant,

vs.

KILOLO KIJAKAZI,
ACTING COMMISSIONER OF
SOCIAL SECURITY,[1]

    Defendant.

No. 20-CV-2035-LRR

**REPORT AND
RECOMMENDATION**

_____

   Sari Nelson ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. Sections 1381-85 and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons that follow, I recommend that the Commissioner's decision be **affirmed in part and reversed and remanded in part.**

_____

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner Kilolo Kijakazi is substituted for Commissioner Andrew M. Saul as the defendant in this suit.

# I. BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 17) and only summarize the pertinent facts here. Claimant was born June 6, 1966. (AR[2] at 242.) Claimant has at least a high school education and is able to communicate in English. (*Id.* at 24.) She allegedly became disabled due to asthma, chronic obstructive pulmonary disease ("COPD"), generalized anxiety disorder, and a pulmonary embolism. (*Id.* at 276.) Claimant's onset of disability date was September 19, 2016. (*Id.* at 242.) Claimant filed applications for SSI and DIB on May 19, 2017. (*Id.* at 10.) Her claims were denied originally and on reconsideration. (*Id.* at 143-56, 166-79.) A video hearing was held on March 14, 2019, with Claimant and attorney Cherie Pichone[3] in Waterloo, Iowa and ALJ Julie K. Bruntz and vocational expert ("VE") Randall Harding in West Des Moines, Iowa. (*Id.* at 36-64.) Claimant and the VE testified. (*Id.* at 38-62.) The ALJ issued an unfavorable decision on May 15, 2019. (*Id.* at 10-26.)

Claimant requested review and the Appeals Council denied review on April 1, 2020. (*Id.* at 1-5.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On June 3, 2020, Claimant timely filed her complaint in this Court. (Doc. 5.) On April 27, 2021, briefing deadlines expired and the Honorable Linda R. Reade referred the case to me for a Report and Recommendation.

# II. DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

---

[2] "AR" cites refer to pages in the Administrative Record.
[3] Ms. Pichone represented Andrew S. Youngman, Claimant's non-attorney representative. (Doc. 10.)

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the

impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to this application that was substantial gainful activity and lasted long enough for the claimant to learn how to

4

do it.  20 C.F.R. § 416.960(b)(1).  If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled.  *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2).  The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy.  *Eichelberger*, 390 F.3d at 591 (citation omitted).

A.    *The ALJ'S Findings*

The ALJ made the following findings regarding Claimant's disability status at each step of the five-step process.  At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset of disability date of September 19, 2016.  (AR at 12.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: degenerative disc disease, asthma/COPD, dysphonia[4] and chronic refractory muscle tension dysphonia, depression, and anxiety.  (*Id.*)  The ALJ found Claimant's pulmonary emboli and deep vein thrombosis, history of a right wrist fracture, Raynaud's syndrome, unspecified knee pain attributed to "'bone-on-bone' arthritis" and/or history of two arthroscopic procedures on her left knee, and history of left cornea transplant in 1991 to be nonsevere impairments.  (*Id.* at 13-14.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination.  (*Id.* at 14.)

_____

[4] Dysphonia is "[a]ltered voice production."  *Stedman's Medical Dictionary* 273600, Westlaw (database updated Nov. 2014).

The ALJ evaluated Claimant's claims under listings 1.00ff (musculoskeletal impairments); 12.04 (depressive, bipolar and related disorders); and 12.06 (anxiety and obsessive compulsive disorders). (*Id.* at 14-15.)[5]

At step four, the ALJ found that Claimant had the following RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) such that she could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand and/or walk for 6 hours with normal breaks in an 8-hour workday; sit for 6 hours in an 8-hour workday with normal breaks; the ability to push and pull, including the operation of hand and foot controls, would be unlimited within these weights; occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; need to avoid concentrated exposure to extreme cold and heat, humidity, fumes, odors, gases, poor ventilation or dust; can understand, remember and appropriately carry out simple instructions, use judgment in making simple work-related decisions, and deal with changes in the routine work setting; occasional contact with the public, coworkers and supervisors; and limited to jobs where talking was not an essential component of the job.

(*Id.* at 15.) The ALJ also found that Claimant was unable to perform any of her past relevant work. (*Id.* at 24.) At step five, the ALJ found there were jobs that existed in significant numbers in the national economy Claimant could perform, including mail clerk, router, and routing clerk. (*Id.* at 25.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.*)

## B.    *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such

---

[5] The ALJ also evaluated Claimant's asthma/COPD and other breathing issues, but did not mention the listings she used to evaluate these impairments in her decision.

6

evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). Thus, a court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III.   DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing conduct a proper analysis of her treating physician's opinion under 20 C.F.R. Section 404.1520c or (B) in the alternative, failing to find her treating physician's opinion "'not persuasive' without reason or logic for doing so." (Doc. 18 at 1.)

***A.*** ***Whether the ALJ Conducted a Proper Analysis of Dr. James Peterson's Physical Opinions Under 20 C.F.R. Section 404.1520c***

Dr. James Peterson is Claimant's primary care physician.  He wrote two opinions for this case, one on July 25, 2017 and one on February 20, 2019.  (AR at 819-28, 1028-31.)  In his July 2017 opinion, Dr. Peterson considered the limitations Claimant would experience in a work setting due to asthma, dyspnea,[6] and back pain.  (*Id*. at 22.)  Dr. Peterson stated, in pertinent part,

> [T]he claimant could lift and carry less than 10 pounds. She needed a sit-stand option during the day. The ability to sit, stand or walk was not quantified. The claimant did not need a cane or other assistive device to ambulate effectively but, at times, might need a cane. She could ambulate 300 feet without a cane. . . . She could occasionally use foot controls with the bilateral lower extremities. She could . . . occasionally balance, stoop, kneel, rarely climb stairs or ramps, crouch and crawl and never climb ladders ropes or scaffolds. . . . She could rarely tolerate exposures low humidity and wetness, dust, odors, fumes or pulmonary irritants as well as extremes of heat and cold. The claimant's symptoms would be severe enough to interfere with attention and concentration needed to perform simple work-related tasks such that the claimant would be off task, approximately 25% of the time. She would be absent four or more days per month.

(*Id*. (ALJ summary).)  In February 2019, Dr. Peterson opined, in pertinent part:

> The claimant could rarely lift and carry less than 10 pounds. She could sit for 6 hours in an 8-hour day and stand and/or walk for one hour in an 8-hour day with a sit-stand option. There was no need for use of an assistive device for ambulation. . . . She could occasionally balance, stoop, kneel, crouch and rotate the head and neck but rarely climb ladders, scaffolds, stairs and ramps. . . . She could occasionally tolerate . . . humidity and

---

[6] "Dyspnea" is the medical term for shortness of breath.  Mayo Clinic, *Symptoms Shortness of Breath,* Definition, https://www.mayoclinic.org/symptoms/shortness-of-breath/basics/ definition/sym-20050890 (last visited Dec. 2, 2021).

wetness . . . but rarely tolerate exposures to . . . dust, odors, fumes and pulmonary irritants, extremes of heat and cold.

(*Id.* at 23 (edited from ALJ summaries).)  The opinions will be referred to collectively as "Dr. Peterson's opinion."

The ALJ evaluated Dr. Peterson's opinion regarding Claimant's physical limitations in the following way:

> Although considered, the opinion limitations assessed were not well-supported by the treatment given relatively non-focal physical and mental status exam findings. However, the claimant was treated for moderate persistent asthma, dysphonia, depression and chronic back pain. To this end, the undersigned finds the opinion partially persuasive to the extent that the claimant would reasonably need accommodation for exertional, postural, communication and environmental limitations as outlined in the residual functional capacity.

(*Id.*)

### 1.  *Relevant Law*

Claimant's claim was filed on or after March 27, 2017.  Therefore, the rules articulated in 20 C.F.R. Sections 404.1520c and 416.920c apply to analysis of this opinion.  Under these rules, no medical opinion is automatically given controlling weight. 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Opinions from medical sources are evaluated using the following factors:  (1) supportability,  (2) consistency,  (3) provider's relationship with the claimant,  (4) specialization,  and  (5) other factors.  *Id.*  §§ 404.1520c(c), 416.920c(c).  Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be."  *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).  The ALJ "may, but [is] not required to, explain how [he or she] considered the factors in paragraphs (c)(3) through (c)(5). . . ."  *Id.*  When a medical source provides multiple opinions, an ALJ is not required to articulate how he or she considered each opinion, but may conduct one single analysis

using the above factors. *Id.* §§ 404.1520c(b)(1); 416.920c(b)(1). If the ALJ finds "that two or more medical opinions or prior administrative findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ] will articulate how [the ALJ] considered the other most persuasive factors in paragraphs (c)(3) through (c)(5)[.]" 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

Interpretation of these rules is the heart of Claimant's dispute with how the ALJ evaluated Dr. Peterson's opinions.

### 2.    *The Parties' Arguments*

Claimant notes that the ALJ found the state agency reviewing physicians' opinions persuasive and Dr. Peterson's opinion partially persuasive. (Doc. 18 at 4; AR at 23-24.) Claimant also notes that an ALJ assessing medical evidence must explain whether a medical opinion is "persuasive" by assessing the "most important factors" of consistency and supportability. (Doc. 18 at 5 (citing, *inter alia*, 20 C.F.R. § 404.1520c(c)).) Claimant points out that the new rules do not absolve ALJs of the obligation to explain their decisions in a way that permits "meaningful judicial review." (*Id.* at 5 & n.3 (citing, *inter alia*, 83 Fed. Reg. 5859, response to comments: "We will articulate how we considered the medical opinions from all medical sources and prior administrative medical findings in a claim. This articulation will include the supportability and consistency factors, which generally includes an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical findings is with other evidence in the claim. Therefore, the final rules are consistent with the intent of the statute that we provide a statement of the case, setting forth a discussion of the evidence, and stating the reasons upon which we based the determination.").) Claimant asserts that "[t]his cannot be more fundamental

10

Case 6:20-cv-02035-LRR-MAR    Document 22    Filed 12/23/21    Page 10 of 34

and is consistent with the requirement that an ALJ must build 'an accurate and logical bridge' between the evidence and [her] conclusions." (*Id.*)

Claimant further asserts that the ALJ must articulate a "binary finding" because "20 C.F.R. § 404.1520c only anticipates finding opinions 'persuasive' or 'not persuasive.'" (*Id.* at 5, 8 (emphasis omitted).) Therefore, according to Claimant, the ALJ's finding that Dr. Peterson's opinion was partially persuasive was actually a finding that the opinion was "persuasive" and equal to the ALJ's finding that the state reviewing physicians' opinions were persuasive. (*Id.* at 5, 8-9.) Claimant argues that the ALJ was thus obligated to "proceed to step two" and consider the other 20 C.F.R. Section 404.1520c and 416.920c factors. (*Id.* at 9.) According to Claimant, the ALJ's error "mattered greatly" because had the ALJ assigned Dr. Peterson's opinion controlling weight, Claimant would only have been found able to perform sedentary jobs, which combined with her age, education, and limitation to unskilled work, would have directed a finding that she was disabled under the grid on her fiftieth birthday. (*Id.* at 8.)

The Commissioner responds that "[t]here is nothing in the regulations that say a medical statement is either 100% persuasive or 100% not persuasive and that there is no range of persuasiveness, as plaintiff wrongly asserts. The new regulations contemplate that there could be a range of persuasiveness as there is a range of how much a medical statement is well-supported and consistent with the record." (Doc. 19 at 8) (citing 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3)).) The Commissioner also cites the following new regulations, which also show that an ALJ's assessment of persuasiveness is not limited to binary findings, but rather that an ALJ can determine that an opinion is less persuasive when it is less supported and/or less consistent with the source's own treatment notes or the record as a whole. (*Id.* at 8-9) ("*The more relevant* the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), *the more*

*persuasive* the medical opinions or prior administrative medical finding(s) will be. . . . *The more consistent* a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, *the more persuasive* the medical opinion(s) or prior administrative medical finding(s) will be.") (quoting 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1); 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2)) (emphasis in original).

### 3.    *Analysis*

I agree with the Commissioner that nothing in the new rules limits an ALJ to finding opinions either "persuasive" or "not persuasive" with no gradations of persuasiveness. The rules cited by the Commissioner contemplate the flexibility to find opinions more or less persuasive. The rules provide that supportability and consistency are the most important factors when determining "*how persuasive* [the ALJ] find[s] a medical source's medical opinions . . . to be." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (emphasis added). In this context, "how" means "to what degree or extent [i.e.,] . . . I don't know *how* old she is." *Merriam-Webster*, https://www.merriam-webster.com/ dictionary/how (last visited Dec. 2, 2021). Thus, the phrase "how persuasive" means "'to what degree or what extent' something is persuasive," not only whether something is persuasive or not persuasive. Therefore, I find Claimant's argument without merit on that basis.

I further find Claimant's argument without merit because under the plain language of the regulations, the obligation to address the additional factors only arises when multiple opinions are *equally well-supported* and *consistent*. *See* 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3). Here, the ALJ found Dr. Peterson's opinion partially persuasive and the state agency reviewing physicians' opinions persuasive. (AR at 23-24.) Thus, the ALJ was under no obligation to address the remaining factors. *See MacCollister v. Comm'r of Soc. Sec. Admin.*, No. CIV-19-382-JFH-KEW, 2021 WL

1134304, at *3 (E.D. Okla. Mar. 9, 2021) (same result when ALJ found one opinion partially persuasive and one opinion not persuasive), *R. & R. adopted,* 2021 WL 1134809 (E.D. Okla. Mar. 24, 2021); *Gogel v. Comm'r of Soc. Sec.*, No. 2:20-CV-366-MRM, 2021 WL 4261218, at *10 (M.D. Fla. Sept. 20, 2021) (same result when ALJ found two opinions "equally unsupported and inconsistent"); *see also Cummings v. Comm'r, Soc. Sec. Admin.*, No. 2:20-CV-01230-ACA, 2021 WL 4820650, at *4 (N.D. Ala. Oct. 15, 2021) (same result when "ALJ did not find that two or more medical opinions were equally well-supported and consistent with the record").

In spite of this, the ALJ did acknowledge that Dr. Peterson was Claimant's family physician, not a specialist. (AR at 24.) She also noted that Dr. Peterson had been treating Claimant since at least 2015, when the ALJ first stated that Dr. Peterson proscribed pain medication for Claimant. (*Id.* at 17.)[7] The ALJ realized that Claimant received treatment from pulmonary specialists for her lung problems, the physical complaint that forms one of the main bases of her current case, and that Dr. Peterson merely monitored and prescribed her medications, such as Prednisone. (*Id.* at 17-18 (citing Drs. Pankaj Meta and Rachael Butler as Claimant's pulmonologists).) Therefore, to the extent Claimant wanted an evaluation of the other factors, the ALJ provided one.

**B.    *Whether the ALJ's Findings Regarding Dr. Peterson's Opinion are Supported by Substantial Evidence in the Record as a Whole***

Claimant argues that "assuming [the error discussed above] can be overlooked, and applying the assumption that the ALJ *meant* to find Dr. Peterson's opinion not persuasive, such a finding is not reasonably or logically tied to the evidence." (Doc. 18 at 9 (emphasis in original).)

---

[7] Dr. Peterson states that he started treating Claimant in 2008. (AR at 1028.)

I do not agree with Claimant's premise that the ALJ meant to find Dr. Peterson's opinion "not persuasive." As discussed above, the ALJ was not required to find Dr. Peterson's opinion either wholly persuasive or wholly not persuasive. The ALJ found Dr. Peterson's opinion partially persuasive. (AR at 23.)

Although Claimant states she has many impairments and the ALJ found several of Claimant's impairments to be severe, she claims the ALJ failed to properly evaluate Dr. Peterson's opinions related to her asthma and back pain. Specifically, Claimant asserts that the record demonstrates that she required the following treatments and experienced the following symptoms that the ALJ failed to properly consider:

[1]   multiple inpatient hospitalizations for respiratory distress/asthma exacerbation and pulmonary embolism;

[2]   the daily use of multiple inhalers, daily nebulizer treatments, oxygen at night;

[3]   the daily use of Prednisone for two years following her onset date, which was adjusted for efficacy repeatedly by Dr. Peterson;

[4]   consistently reported shortness of breath with minimal exertion, including lifting as little as 5 pounds . . .; and

[5]   activities of daily living [that] were essentially all limited by her asthma and back pain.

(Doc. 18 at 15 (format changed from original).) Claimant asserts that while the ALJ found Dr. Peterson's opinion "not well supported 'by the treatment' given, she did not point to any place in the record critiquing his treatment or detail what treatment might suggest that Plaintiff is not as limited as opined by her treating physician." (*Id.*) The following analysis will focus on Claimant's asthma and back pain.

Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). These are the two factors I will analyze below. As discussed above, the ALJ properly did not discuss the remaining factors.

14

Dr. Peterson is board certified in family practice. (AR at 819, 1028.) He began treating Claimant in 2008. (*Id.* at 1028.)

### 1.    *Supportability*

"The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1). Dr. Peterson is Claimant's primary care physician and treated her for, in pertinent part, asthma; dysphonia; pulmonary embolism; COPD; osteoarthritis of the spine; and back pain. (AR at 819, 1028.) Dr. Peterson attempts to provide support for the conclusions in his check-box, fill-in-the-blank opinions. For example, in his 2017 opinion, Dr. Peterson appears to state that Claimant's "moderate persistent asthma—steroid dependent," "dysphonia," "chronic back pain," and "dyspnea" justify the limitations in the opinion. (*Id.* at 820.) This "support," however, is nothing more than a reiteration of Claimant's diagnoses and not the particular medical or clinical findings the form asks the opinion writer to provide as support. Dr. Peterson provided better support in his 2019 opinion where he cited a November 2016 CTA of Claimant's chest that showed bilateral pulmonary emboli; a December 2016 pulmonary function test; and chronic lumbar back pain, moderate persistent asthma, and dysphonia. (*Id.* at 1029-30.) Again, the listing of chronic back pain, moderate persistent asthma, and dysphonia, alone, would do nothing to add to the quality of Dr. Peterson's check-box, fill-in-the-blank form opinion.

The ALJ acknowledged the November 2016 CTA of Claimant's chest that showed bilateral pulmonary emboli. (*Id.* at 13, 491.) The ALJ continued, "She was discharged [from the hospital] on anticoagulants and discontinued Prempro. CT scans indicated resolution. The claimant experienced no further occurrences. Eliquis was discontinued. The record additionally noted a pulmonary nodule that remained stable based on

monitoring CT scans. (Ex 2F, 3F)." (*Id.* at 13.) Claimant does not take issue with these findings of the ALJ.[8]

The 2016 pulmonary function test cited by Claimant showed "[m]oderate obstructive defect with positive [bronchodilator] response, with high normal [residual volume], normal [total lung capacity] and mild decrease in DLCO.[9] Elevated carboxyhemoglobin [consistent with] smoking status."[10] (*Id.* at 506.) The ALJ also acknowledged this test: "Pulmonary function studies conducted in December 2016 remained unchanged from prior studies and noted no significant COPD progression as well as a positive bronchodilator response. Lungs remained clear to auscultation with normal breath sounds and no evidence of wheeze, rhonchi or rales."[11] [12] (*Id.* at 22.) Claimant also does not take issue with this finding of the ALJ.

The ALJ stated,

 [Claimant] experienced the onset of upper respiratory issues in approximately 2012 and was subsequently diagnosed with moderate

---

[8] Dr. Peterson also cited a July 2018 CT scan of Claimant's abdomen/pelvis that showed degenerative changes of Claimant's lumbar spine as support for his 2019 opinion. (AR at 1029.) The parties do not mention this CT scan in the Joint Stipulation of Facts (Doc. 17) and the ALJ does not mention this CT scan. It therefore appears that this scan is not part of the administrative record in this case.

[9] "DLCO" is an acronym for "diffusing capacity of the lung for carbon monoxide." The Cleveland Clinic, *Gas Diffusion Study*, https://my.clevelandclinic.org/health/diagnostics/15445-gas-diffusion-study (last visited Dec. 7, 2021).

[10] Claimant smoked a pack of cigarettes a day until May 2018. (AR at 18, 896.) She continued to rely on the nicotine patch for at least some time after that date. (*Id.* at 896.)

[11] "Rhonchi" is the plural of "rhonchus." *Stedman's* 783490, Westlaw (database updated Nov. 2014). Rhoncus is "[a]n added sound with a musical pitch occurring during inspiration or expiration, heard on auscultation of the chest and caused by air passing through bronchi that are narrowed by inflammation, spasm of smooth muscle, or presence of mucus in the lumen. . . ." *Id.*

[12] A "rale" is an "[a]mbiguous term for an added sound heard on auscultation of breath sounds; used by some to denote rhonchus and by others for crepitation. SYN: crackle." *Id.* 750960.

persistent asthma. Symptoms were managed on two inhalers, Advair and Alvesco. . . . [She] was also prescribed Albuterol. . . . In August 2016, symptoms were well-controlled. Spirometry, conducted at this time, noted no significant change. The claimant admitted to discontinuing her inhalers resulting in an exacerbation. With resumption of treatment, symptoms significantly improved. The claimant reported worsening of symptoms in the late summer/early fall as well as springtime.

(*Id.* at 17 (citations omitted).)

As the ALJ stated, in September 2016, Claimant was hospitalized for exacerbation of asthma symptoms. Claimant's cough was not improving with use of her then-current inhaler and nebulizer treatments. (*Id.* at 17, 445-47 (Sept. 18, 2016 treatment notes).) Claimant was admitted experiencing "respiratory distress" with decreased breath sounds bilaterally and was admitted to the hospital where she received high dose intravenous steroids and Borvana and Pulmicort nebulizer treatments. (*Id.* at 17, 441-42.) Claimant was discharged on September 21, 2016 after her symptoms improved, prescribed a nebulizer and other medications, and given a three-day work excuse. (*Id.*) On September 27, Claimant followed up with Dr. Peterson, who noted that Claimant was doing a little bit better "for the most part," although she was still hoarse and coughing, which hurt her back. (*Id.* at 569.) Claimant was also very weak and tired. (*Id.*) She had normal breath sounds; no wheezes, rhonchi, rales, or tenderness; and was in no respiratory distress. (*Id.* at 570.) Claimant had completed her antibiotics and was tapering her Prednisone. (*Id.*) She moved stiffly and slowly and had a positive straight leg raise at 45 degrees,[13] but had normal range of motion, normal strength and muscle tone, normal coordination and gait. (*Id.*) On October 4 and November 4, 2016, Claimant returned to Dr. Peterson, where she reported she felt a little bit better each visit. (*Id.* at 572, 585.) In October,

---

[13] A straight leg raise test "helps pinpoint . . . affected nerves and determines if there is a problem with [a patient's] disks." Cleveland Clinic, *Sciatica,* https://my.clevelandclinic.org/ health/diseases/12792-sciatica (last visited Dec. 16, 2021).

Claimant tried to reduce her Prednisone to 10 mg, but felt more chest tightness when she did so. (*Id.* at 572.) In both October and November, Claimant was hoarse with paroxysms of coughing. (*Id.* at 573, 586.) However, she had normal breath sounds; no wheezes, rhonchi, rales, or tenderness; and was in no respiratory distress. (*Id.*) Although she had a positive straight leg raise test at 45 degrees in October and moved "stiffly and slowly" in both October and November, Claimant had normal gait, range of motion, strength, reflexes, and muscle tone both months. (*Id.* at 573-74, 587.) Claimant reported fatigue October 4, 2016 and told Dr. Peterson she still tired easily with activity on November 4, 2016. (*Id.* at 572, 585.) However, by November 11, 2016, even though Claimant still claimed some fatigue, she reported an increased energy level, that she felt she was getting better, and that she hoped to return to work in a week. (*Id.* at 589.) Although Claimant's voice was hoarse and breathless and she had paroxysms of coughing, she had a normal, although stiff and slow, gait. (*Id.* at 590.)

By the end of November 2016, Claimant complained to Dr. Peterson that she had experienced increased cough and pain in the left-side of her chest for several days. (*Id.* at 596.) Claimant still had not returned to work after being hospitalized in September and complained of fatigue, although admitted to no activity change other than not working. (*Id.*) She was still very hoarse with paroxysms of coughing and moved slowly and stiffly. (*Id.* at 597.) In spite of this, she breathed with normal effort, had no wheezes, rhonchi, or rales, and was in no respiratory distress. (*Id.*) On November 29, 2016, Claimant was admitted to the hospital "with a diagnosis of pulmonary embolus and pleuritic chest pain." (*Id.* at 18, 443-44.) She was discharged on December 2, 2016. (*Id.* at 443-44.) During her hospital stay, "a chest x-ray demonstrated an infiltrate in the left lower lung field, and a CT scan demonstrated bilateral pulmonary emboli, and probable bilateral basal pulmonary infarcts, small left pleural effusion and bilateral lower lobe pulmonary atelectasis." (Doc. 17 at 4 (citing AR at 443, 494-95).) Claimant

received an injection of Lovenox during her hospitalization and was started on Eliquis, a tapering dose of Prednisone, and low-flow oxygen, and her estrogen hormone replacement therapy was discontinued. (AR at 18, 444.) Upon discharge, Claimant's final diagnoses were pulmonary emboli, bilateral; moderate persistent asthma; and chronic dysphonia. (*Id.* at 443.)

The ALJ noted that in December, Claimant "remained off work per Dr. Peterson," was using oxygen at night, that her Advair had been increased, and Prednisone was being tapered. (*Id.* at 18, 604, 607 (Jan. 6, 2017 treatment note).) Dr. Peterson noted on December 22, 2016, that "overall, [Claimant was] encouraged" and felt "better than she ha[d] in the last six to eight weeks," although treatment notes still marked Claimant "positive" for fatigue. (*Id.* at 604.) Claimant continued off work in January 2017 and reported to Dr. Peterson that she lost her job that month. (AR at 18, 610.)

Claimant saw Dr. Peterson at least monthly for medication checks related to several issues relevant to her appeal to this court. In fact, the majority of the over 1000-page administrative record consists of Dr. Peterson's treatment notes. As the ALJ noted, Claimant attempted to taper down her daily use of Prednisone with varying levels of success. (AR at 17-19.) Dr. Peterson's treatment notes indicate that Claimant would taper down her Prednisone and then often have to increase her dosage if she experienced chest tightness or more coughing. (*Id.* at 621, 628, 631, 837, 839-40, 955, 961, 983, 996, 1000.) Claimant has never been able to taper her Prednisone to below 7 mg a day. (*Id.* at 1000.)

Although Dr. Peterson noted hoarseness and/or breathless voice and paroxysms of coughing at most appointments during the relevant time period (*Id.* at 608, 622, 626, 630, 690, 845, 955 ("frequent coughing," no notes about voice), 961 (same), 965 (same), 983-94 ("vocal cord dysfunction" and cough), 897 ("frequent coughing"), 997 (same), 1001 (same)), Claimant's pulmonary examinations were mostly normal with normal

effort and breath sounds and no respiratory distress, wheezes, rales, or tenderness, in spite of complaints of chest tightness, wheezing, and other symptoms. (*See, e.g.* AR at 19, 608, 897, 955, 965, 984, 997, 1001.)

In February 2017, Claimant returned from visiting her mother in Arizona and told Dr. Peterson she had felt better while in Arizona, but was experiencing increased coughing, wheezing, and intermittent chest pain and tightness now that she was back in Iowa. (*Id.* at 614.) Her pulmonary examination produced mostly normal results: although Claimant had rales and exhibited tenderness, she had normal effort, no respiratory distress, wheezes, or ronchi. (*Id.* at 615.) In March, Claimant was trying to increase her walking, and her pulmonary examination produced the same results as in February. (*Id.* at 621-22.) In April, Claimant complained about increased sinus issues, but admitted they might have been due to a home painting project. (*Id.* at 624.) In May, Claimant told Dr. Peterson that she seemed to slowly be getting better. (*Id.* at 628.) Claimant's pulmonary examination results were the same in April, May, June, and August, 2017: mostly normal, with rales and tenderness. (*Id.* at 626, 630, 842, 846.)

Dr. Peterson also noted that although Claimant moved slowly and stiffly much of the time, she did so with a normal gait. (*Id* at 608, 615, 622, 626, 630, 690, 838, 845.) In spite of this, other than noting some edema in Claimant's lower left leg, Claimant's musculoskeletal examination results were usually normal, with a full range of motion on examination. (*Id.* at 608, 615, 622, 626, 630, 690, 838[14], 845.) Even when Claimant complained of swelling in her left lower leg in June 2017, she was able to walk slowly around stores. (*Id.* at 19, 840.) Except for a slight limp in October 2018, Dr. Peterson's latest treatment notes beginning in January 2018 all show normal musculoskeletal

---

[14] The musculoskeletal examinations on AR 630, 690, and 838 also document tenderness along the medial left knee with no effusion, apparently related to an old knee problem. (AR 538-29 ("She has had problems with her knees in the past.").)

examinations and say nothing about Claimant walking slowly or stiffly. (*Id.* at 955, 961, 992-93, 997, 1000-01.) Likewise, when Claimant reported back pain to Dr. Peterson, the results of Dr. Peterson's most recent musculoskeletal examinations were normal. (*Id.* at 845, 891-92, 911-12, 955, 961, 997, 1000-01.)[15]

Claimant argues that the ALJ characterized her pulmonary examinations as "essentially normal, while generally ignoring Dr. Peterson's repeated findings that the Plaintiff was hoarse, breathless, and experienced paroxysms of coughing." (Doc. 18 at 14.) Claimant is incorrect. Dr. Peterson's objective treatment notes contain a section called "Pulmonary/Chest" where Dr. Peterson documents his findings regarding whether he heard wheezing, rales, crackles, normal effort and breath sounds, or any respiratory distress during his examination. As the ALJ noted, these findings were mostly normal

---

[15] Claimant also had a history of receiving Botox treatments for her dysphonia. The ALJ succinctly summarized her treatments in the following way:

> In approximately May 2014, the claimant was diagnosed with dysphonia and chronic refractory muscle tension dysphonia treated with EMG-guided laryngeal Botox injections. Symptoms of change in voice occurred in conjunction with developing upper respiratory issues. The last injection received was in June 2016. The claimant reported 80% improvement following her previous injection in January 2016. Vocal conservation was additionally a part of treatment. In September 2015, the claimant requested to have her work restrictions lifted. As such, Dr. Peterson indicated the claimant could speak on the phone 15 minutes out of every hour.

> Following an acute asthma exacerbation in September 2016 with residual hoarseness, the claimant was encouraged to return for a Botox injection. However, the injection was put on hold due to continued issues with cough. The claimant requested to undergo transnasal laryngoscopy, which evidenced intact mobility to normal appearing vocal folds without evidence of airway obstruction. Although directed to return when recovered, no further Botox injections followed. (Ex 2F, 3F, 6F/4).

(AR at 16-17.)

over the many years Dr. Peterson has treated Claimant. (AR at 17-19.) Dr. Peterson sometimes noted hoarseness/breathlessness under "Mouth Throat" and sometimes under "Pulmonary/Chest." (*E.g.,* 608, 622, 626, 630, 690, 845.) Paroxysms of coughing were usually noted under "Pulmonary/Chest," sometimes in conjunction with hoarseness and sometimes alone, but not in the same sentences in which Dr. Peterson listed his examination results. Claimant seems to want to give the impression that the ALJ ignored Dr. Peterson's findings regarding Claimant's voice issues when the ALJ clearly did not. The ALJ actually adopted the limitation to "limited use of voice" from Dr. Peterson's mental health opinion into the RFC, which limits Claimant to jobs "where talking was not an essential component of the job." (AR at 15, 1036.) The ALJ also acknowledged several times where Dr. Peterson documented Claimant's cough. (*Id.* at 16-19.)

Claimant next asserts that she is unable to walk the six hours-per-day that is required by the ALJ's RFC. She argues that the ALJ ignored all the times Dr. Peterson documented fatigue and that she ambulated stiffly and slowly. Claimant takes issue with the ALJ's failure to acknowledge that Dr. Peterson often stated that she was fatigued or became tired after limited exertion. (Doc. 18 at 13 (citing, *inter alia*, AR 569, 572, 585, 600, 604, 610, 624, 904, 907, which were cited previously in Doc. 18).)

Claimant is partially correct. Dr. Peterson's treatment notes often state that Claimant reported she was fatigued, tired easily, or became breathless with exertion. The notes, however, rarely give any concrete examples such as when Claimant said she became tired taking the vacuum out of the closet four months after she was hospitalized for breathing problems in September 2016. As detailed above, Claimant experienced an exacerbation of her symptoms in late 2016, which resulted in two hospitalizations in the autumn of that year. Dr. Peterson did not document independent observations that Claimant appeared fatigued, tired, or even napped during the day. On the contrary, Dr. Peterson's treatment notes contain very little about Claimant's day-to-day life other than

22

notations regarding her trips to Arizona and that she felt better while in Arizona. (*Id.* at 734, 738, 891, 906, 909.) In spite of this, Dr. Peterson obviously believed that Claimant's asthma and related symptoms caused her fatigue because, as the ALJ noted, in September 2016, Dr. Peterson excused Claimant from work due to her reports of weakness and fatigue. (AR at 17.) Dr. Peterson's treatment notes also state that Claimant was very weak or became weak, tired, or breathless quite easily or with minimal activity. (*Id.* at 569, 572, 585, 600, 610, 624.) The ALJ documented Claimant's ongoing examinations with Dr. Peterson where Claimant reported that she felt she could not return to work and Dr. Peterson provided Claimant work excuses through January 2017. (*Id.* at 17-18.) Thus, the ALJ acknowledged Claimant's fatigue and that Dr. Peterson gave Claimant work excuses because of it, at least early in the relevant time period.

Regarding Claimant walking stiffly and slowly, Claimant argues that although the ALJ acknowledged that physical examinations consistently noted she had a "normal gait," the ALJ failed to acknowledge that Dr. Peterson "repeatedly [found] that the Plaintiff ambulated slowly and stiffly." (Doc. 18 at 14 (citations omitted).) This argument is without merit. The ALJ stated that in October 2018, "[p]hysical exams consistently noted a slow and stiff but normal gait." (AR at 16.) The ALJ even acknowledged "a slight left-sided limp in 2018" and that "straight leg raises were positive at 45 degrees on the left without evidence of neural impingement on MRI studies" with normal strength, range of motion, and no need for an assistive device. (*Id.*)[16] All of the exhibits cited by the

_____

[16] For support, Claimant cites two findings of positive straight leg raising on left at 45 degrees that pre-date Claimant's onset of disability date. (AR at 564 (March 11, 2016), 567 (Sep. 16, 2016).) Moreover, even if I consider these treatment notes, four positive straight leg raise tests out of all the tests Dr. Peterson administered over the years are not significant and the ALJ did not err by failing to give the tests more weight.

ALJ encompass Dr. Peterson's treatment notes.[17]  Dr. Peterson documented stiff and slow ambulation or a limp at many monthly medication checks.  (AR at 570, 573-74, 587, 590, 608, 615, 630, 690, 1001.)  The ALJ was not required to cite every piece of redundant evidence in the record.  *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (an ALJ is not required to discuss every piece of evidence submitted) (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).  Importantly, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  *Id.* (bracket in original).

This, however, does not end the inquiry.  Claimant's entire argument is premised on the theory that the ALJ should have found her unable to perform light work because she is unable to, among other things, walk the six hours out of an eight hour day required for light work.  Except for the last few treatment notes in the record, Dr. Peterson consistently found that Claimant walked slowly and stiffly.  Neither party has cited any caselaw, rule, or other guidance from the Social Security Administration explaining how fast an employee needs to walk to be capable of light work.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a *good deal of walking or standing*, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. *To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.*

---

[17] The ALJ cites exhibits 6F, 8F, 14F, and 15F, which cover a much broader range of dates than only October 2018.  These exhibits cover dates from September 2015 to June 2017 and October 2017 to October 2018.  Dr. Peterson's treatment notes are contained in exhibits 5F, 6F, 7F, 8F, 11F, 14F, and 15F.  Because the ALJ does not use pinpoint citations, it is impossible to tell exactly what pages of the record she refers to in her citations, unless the text of the decision is very specific.  The parties have cited to many documents within the exhibits cited by the ALJ.  Without parameters from the ALJ, this is appropriate.  I, too, cite to specific pages within the exhibits cited by the ALJ.

20 C.F.R. § 416.967(b) (emphasis added). Here, the ALJ noted that Claimant could do light work with certain exertional limitations, but did not provide any limitations on walking other than limiting Claimant to occasionally climbing ramps and stairs and to never climbing ladders, ropes, or scaffolds. (AR at 15.) My independent research of Social Security cases in the Eighth Circuit shows that claimants who walk slowly are usually limited to, at most, sedentary work. *See, e.g.*, *McMillian v. Schweiker*, 697 F.2d 215, 221-22 (8th Cir. 1983) (reversing ALJ's decision that claimant could do sedentary work in part because "[w]hile the medical reports do indicate that McMillian can walk independently, this circuit has recognized that "the mere fact that [the claimant] . . . is mobile does not establish that he can engage in substantial gainful activity" and holding that Claimant's ability to occasionally walk a mile did not discredit claimant's testimony that he needed to rest after any exertion) (quoting *Yawitz v. Weinberger,* 498 F.2d 956, 960 (8th Cir. 1974)) (second bracket and ellipses in original); *Andrews v. Schweiker*, 680 F.2d 559, 560 (8th Cir. 1982) (holding that substantial evidence supported ALJ's decision that claimant could perform sedentary work when medical examinations showed he could "stand or walk slowly for four hours and lift twenty pounds if necessary" and that he could perform an occupation requiring standing or walking to a "moderately limited degree"); *Shear v. Saul*, No. 1:18 CV 178 RWS, 2019 WL 4750407, at *8 (E.D. Mo. Sept. 30, 2019) (affirming ALJ's decision that claimant could perform sedentary work when she walked slowly, but nothing in the record indicated "a disabling difficultly in standing and walking" and she could walk half a mile before needing to stop); *Kerns v. Colvin*, No. 415-CV-1483-CASJMB, 2016 WL 4367219, at *2, *7, *15 (E.D. Mo. July 27, 2016) (claimant had ability to do sedentary work with additional limitations even though she, *inter alia*, walked slowly); *R. & R. adopted*, 2016 WL 4263209 (E.D. Mo. Aug. 12, 2016); *Blodgett v. Astrue*, No. CIV.

08-5038-KES, 2009 WL 2410968, at *1, *4, *9, *29-30 (D.S.D. Aug. 4, 2009) (adopting R. & R. recommending that court affirm ALJ's decision that claimant could perform sedentary jobs when she, *inter alia*, walked slowly). *But see Whiteside v. Colvin*, No. 2:13CV00166 JLH-JJV, 2014 WL 4388271, at *1-2 (E.D. Ark. Sept. 4, 2014) (affirming decision of the ALJ that the claimant could perform "some light work" when record showed, *inter alia*, that while she "walk[ed] slowly, . . . nothing show[ed] she cannot ambulate effectively.")

While every case is decided on its own merits and the cumulative effects of the claimants' impairments in the cited cases may have justified greater limitations than the limitations in the case at bar, the ALJ acknowledged that Claimant consistently walked slowly and stiffly, even though she had a normal gait. The question becomes whether someone who consistently walks slowly and stiffly can walk up to six hours a day on a fulltime basis and do so up to the standards required by an employer. *See Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005) (noting that "the test is whether the claimant has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'") (quoting *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)); *Giles v. Barnhart*, 368 F. Supp. 2d 924, 944 (N.D. Iowa 2005) (same).

Dr. Peterson's treatment notes never state that Claimant did much that was physically taxing. In March 2017, Dr. Peterson noted that Claimant was trying to walk more, but also said that she was having difficulty tapering down from 15 mg of Prednisone a day. (AR at 621.) Dr. Peterson instructed Claimant to try tapering down to 10 mg of Prednisone over the next few weeks. (*Id.* at 623.) In April, Claimant was alternating 12.5 mg and 10 mg of Prednisone daily and her cough had increased. (*Id.* at 624.) She tired easily and got short of breath with even minimal activity. (*Id.*) By May, Dr. Peterson had to increase Claimant's Prednisone to 20 mg for a week because

Claimant's cough had gotten so bad on her tapered dose of 7.5 mg that she almost passed out when she coughed. (*Id.* at 628, 631.) Dr. Peterson increased her Prednisone to 20 mg daily for 7 days to be followed by a tapering plan. (*Id.* at 631.) By mid-June, Claimant had only tapered to 17.5 mg alternating with 15 mg daily. (*Id.* at 689.) By August, Claimant had tapered to 10 mg daily, but was experiencing increased coughing, wheezing, shortness of breath, and other symptoms. (*Id.* at 844.) Claimant's cough was aggravated by any type of activity. Dr. Peterson had to increase her Prednisone to 40 mg daily for one week, after which Claimant was to taper to 20 mg daily for one week and then begin tapering by 2.5 mg a day every week. (*Id.* at 846.) Claimant was only able to taper to 7 mg daily by October 2018, but Dr. Peterson still noted "frequent coughing." (*Id.* at 1001.)

Dr. Peterson did note that Claimant went to Arizona and California a few times during the relevant time period and that her breathing was better in Arizona, but did not note any activities Claimant participated in while there. Thus, I find that Dr. Peterson's treatment notes support the walking limits in his opinion. Dr. Peterson consistently noted that Claimant had paroxysms of coughing, was fatigued, and that she moved slowly and stiffly. He stated that Claimant's low back pain and moderate persistent asthma supported these limitations. (*Id.* at 1029.) Dr. Peterson's treatment notes also state that Claimant becomes fatigued with exertion and activity. (*Id.* at 569, 572, 585, 600, 610, 624.) The case law does not indicate that someone who walks slowly, much less stiffly, is necessarily capable of light work. Therefore, this factor weighs in favor of finding Dr. Peterson's opinion more persuasive.

### 2. *Consistency*

"The more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(2).

During the relevant time period, Claimant was under the care of two pulmonologists for her asthma: Dr. Pankaj Mehta and Dr. Rachael Butler. As the ALJ noted, in September 2016, after Claimant's first relevant hospitalization, Claimant had a follow-up appointment with Dr. Mehta, who noted that Claimant was improving and had a normal pulmonary/chest examination with "normal respiratory effort, normal breath sounds, [and] without evidence of wheeze or rales." (AR at 17, 425-26.) As noted above, Dr. Butler stated in December 2016 that Claimant had "[m]oderate obstructive defect with positive [bronchodilator] response, with high normal [residual volume], normal [total lung capacity] and mild decrease in DLCO. Elevated carboxyhemoglobin [consistent with] smoking status." (*Id.* at 506.) Claimant returned to Dr. Butler in March 2017 and reported that she was able to walk her dog one mile and do her own shopping, although she became short of breath when she carried things. (*Id.* at 18, 501.) Claimant had no complaints and was interested in information to help her quit smoking. (*Id.* at 501.) Dr. Butler noted occasional coughing during Claimant's examination. (*Id.* at 502.) Claimant reported no back or other problems to Dr. Butler during either appointment, although it does not appear that Dr. Butler asked about such problems. (*Id.* at 501-03.)

Paul M. Conditt, Psy.D., performed a mental status examination on Claimant on July 27, 2017. (*Id.* at 831-34.) Dr. Conditt reported that Claimant "takes her dogs out, feeds the animals, plays on the computer, and gets dressed" daily. (*Id.* at 833.) Claimant reported that she "'does not do much of anything' other than watching television and taking the dogs out." (*Id.*) Although Claimant does household chores, she told Dr. Condit they take longer than they normally would because bending and twisting hurts her back. (*Id.*) Claimant becomes short of breath when she takes a shower. (*Id.*) Claimant and her fiancée do their shopping together, but do not "look around at things" and if they "make big trips," Claimant is "done by the time they get home" and has to lie down because her back hurts. (*Id.*) Claimant also reported that walking makes her back hurt

28

and makes it difficult to breathe. (*Id.*) Dr. Conditt noted more than once that Claimant seemed to be uncomfortable while sitting and that she had to shift in her seat during the evaluation. (*Id.* at 831, 833.) In relevant part, Dr. Condit concluded that although Claimant has the ability to carry out instructions and maintain pace, it will take her much longer than someone else "because any form of movement causes shortness of breath and may trigger asthma attacks. . . ." (*Id.* at 834.) Dr. Condit stated that Claimant's back pain and sciatic nerve pain would also "adversely affect her pace." (*Id.*) The ALJ found Dr. Condit's opinion "persuasive considering the claimant's subjective symptom reports in combination with reported physical limitations to the extent outlined in the residual functional capacity." (*Id.* at 24.)

Two months later, in September 2017, Claimant was bowling with a nine-pound ball while visiting her son in San Diego when she "stepped onto the slippery surface . . . and broke her wrist. (*Id.* at 867.) Claimant had no "no problems getting up. No problems walking. No numbness or weakness in the lower extremities." (*Id.* at 868.)

The state agency reviewing physicians found Claimant had the RFC to perform a range of light work. (*Id.* at 92, 113.) On July 14, 2017, Dr. Michael Finan noted that although Claimant moved slowly, her gait was normal, as were her strength, reflexes, and sensation. (*Id.* at 92.) Dr. Finan noted that while Claimant stated that she experienced increased back pain standing more than 10 minutes, riding in a car more than 30 minutes, or lifting more than 10 pounds, Claimant also reported she could prepare simple meals, perform light household chores, drive, and shop. (*Id.*) Claimant also said she can walk half a block. (*Id.*) He found she could perform light work with certain limitations. (*Id.* at 89-92.) Rene Staudacher, D.O. affirmed the decision on October 12, 2017. (*Id.* at 113.) The ALJ found the opinions persuasive. (*Id.* at 24.)

Claimant sought chiropractic care for pain and tightness in her back, left buttocks, and left leg from August 2017 to May 2018 while she was in Arizona. (*Id.* at 849-66.)

Claimant consistently rated her pain between a 7 and 10 on a 10-point scale and said that movement and prolonged sitting exacerbated her pain. (*Id.*) Claimant's chiropractor, Dr. Dominic R. Martinez, did not state whether Claimant progressed in her treatment, but did note that she tolerated her treatment well.

The ALJ noted that third-party function reports from Janice Means, Claimant's mother, and Terry Pietan, Claimant's fiancé, were generally supportive of Claimant's allegations. (*Id.* at 22, 298-305, 318-25.)

Claimant testified that her last job was in the billing office at Covenant Clinic, where she was given accommodations to lifting no more than ten pounds and was restricted to speaking on the phone no more than 15-minutes-an-hour. (*Id.* at 43.) The rest of the time, Claimant was to speak as little as possible. (*Id.*) This is the job Claimant lost when she was sick in late 2016. (*Id.* at 42.) She also testified that "taking her dogs out" means putting them on leashes and "tak[ing] them to our yard, and let[ting] them do their pottying and tak[ing] them back in." (*Id.* at 52.) During the hearing, Claimant had to switch positions from sitting to standing and had to use her inhaler. (*Id.* at 41, 44.)

The Commissioner argues that the objective medical evidence does not support Claimant's claims and that Claimant's activities also support the ALJ's conclusion that Claimant can perform light work with the limitations provided in the RFC. (Doc. 19 at 11-12.) The Commissioner notes that Claimant can walk her dogs; shop; care for her animals; play on the computer; attend to her personal needs; watch television; maintain relationships with her mother, son, fiancé, ex-husband, and friends; read; fish; walk; take short trips; travel to Arizona; bowl; and do household chores. (*Id.* at 12.) The Commissioner also notes that Claimant said that she misses walking and cannot do it when it is humid. (*Id.*)

First, while Dr. Peterson did note mostly normal objective findings in Claimant's musculoskeletal and pulmonary examinations, as discussed above, Dr. Peterson also consistently noted paroxysms of coughing in his objective findings and that Claimant moved slowly and stiffly in his objective examinations. In addition, Dr. Condit, who was not even tasked with evaluating Claimant's physical limitations, noted that Claimant's breathing difficulties, which manifested in coughing spasms, would affect her pace.

Second, the Commissioner assigns too much weight to sedentary tasks Claimant does at home that have no relation to whether she can walk six hours a day. In her October 2, 2017 Function Report, Claimant stated that her daily routine consists of the following activities: "Get up, brush teeth, comb hair, dress. Take dog outside 3-4x per day. Wash dishes, feed pets. Eat lunch, watch T.V. Read. Take nap. Have supper. Go to bed." (AR at 328.) Claimant stated that her fiancé takes the dogs out if she is too fatigued, it is too humid, or she is not feeling well due to "fatigue, pain, and shortness of breath." (*Id.*) Claimant now showers only every other day because showering makes her short of breath. (*Id.* at 328.) Claimant can see to all her other personal needs such as feeding and dressing herself. (*Id.*) Claimant also stated that her household chores consist of cooking frozen meals, soup, or making sandwiches once a day, cleaning, doing dishes, and laundry. (*Id.* at 329.) Claimant's cooking takes about 15-20 minutes-a-day. (*Id.*) Claimant testified that when she cleans, she does one chore a day. (*Id.* at 44.) Claimant stated that cleaning can take up to an hour and sometimes she needs help because she is short of breath or her back hurts. (*Id.* at 44, 329.) It takes Claimant about half-an-hour to wash dishes and standing that long hurts her back. (*Id.* at 334.) Claimant's fiancé does most of the cooking. (*Id.* at 329.) Claimant buys pet food online and groceries in a store once a week, which can take up to an hour because she has to move slowly, which makes her back hurt due to her having to stand and walk longer. (*Id.* at 330.) Her fiancé accompanies her to the grocery store. Claimant stated in her June 2017

31

Function Report that friends occasionally came to visit. (*Id.* at 288.) However, by October 2017, Claimant stated that she did not spend time with other people due to the unpredictability of her asthma. (*Id.* at 331.) Claimant's hearing testimony was in concert with these statements. (*Id.* at 44, 52 (Claimant testified that although she does not spend much time on the computer, she probably spends an hour a day playing games on her phone).)

The record does document that Claimant visited her son in California once and her mother in Arizona twice. (*Id.* at 734, 738, 867, 891, 906, 909.) The Commissioner does not explain how Claimant's close relationships with her family tend to show she is able to work at the light exertion level. While Claimant had to fly to California and Arizona, which arguably shows some exertion, Claimant took an oxygen tank with her on at least one trip to Arizona (*Id.* at 734) and, more importantly, Claimant stated that she felt better when she was out west. (*Id.* at 738, 906.) One of the last treatment notes in the record stated that Claimant planned to spend the winter of 2018-19 in Arizona. (*Id.* at 1000.)

Finally, contrary to the Commissioner's assertion, Claimant stated that although fishing used to be one of her hobbies, she does not do it anymore, although she reads and watches television daily. (*Id.* at 331.) In addition, Claimant stated in her June 2017 Function Report that she likes to bowl, but had not been able to do so for a month due to back and leg pain and breathing issues. (*Id.* at 288.) Claimant did not even list bowling as an activity she does in her October 2017 Function Report. (*Id.* at 331.) In spite of that, Claimant was bowling in September 2017 when she broke her wrist. (*Id.* at 867.) The discrepancy can possibly be explained because Claimant admits that she breathes better when she is out west. Even without that explanation, bowling twice in over two years is not fatal to Claimant's claim. "[I]t is well-settled law that a claimant need not

prove she is bedridden or completely helpless to be found disabled." *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (citations and internal quotation marks omitted).

Finally, the ALJ noted that in March 2017, Claimant told Dr. Butler she walked her dog one mile. (AR at 18.) The same month, Claimant told Dr. Peterson that she was trying to walk more. (AR at 621.) However, as discussed above, Claimant experienced an exacerbation of her symptoms over the next two months when she tried to taper her Prednisone and tried to engage in any activity to the point where Dr. Peterson had to increase her Prednisone to 40 mg daily. It took Claimant months to taper her Prednisone back to the dosage she was on in March without experiencing unacceptable coughing. Claimant did not get down to 7.5 mg of Prednisone daily until October 2018, two years after her initial hospitalization. One notation of walking one mile does not indicate that this level of activity is something Claimant is able to maintain on a regular basis. Even if she was able to walk a mile more often than that, this circuit has recognized that a claimant's ability to occasionally walk a mile did not discredit testimony that the claimant needed to rest after any exertion. *McMillian*, 697 F.2d at 221-22.

Accordingly, I find that this factor also supports finding Dr. Peterson's opinion more persuasive.

### C. Conclusion

I find that the ALJ did not properly consider whether Claimant's ability to walk slowly and stiffly means she has "the ability to perform the requisite physical acts [of light work] day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Draper*, 425 F.3d at 1131 (quotation omitted); *Giles*, 368 F. Supp. 2d. at 944. On remand, the ALJ should conduct a proper analysis of Claimant's ability to walk six hours in an eight hour day as required to perform light work.

## IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm in part and reverse and remand in part** the decision of the ALJ. I recommend that the District Court **reverse and remand** the case for the ALJ to conduct a proper analysis of Claimant's ability to walk six hours in an eight hour day as required to perform light work and **affirm** the ALJ's decision in all other respects as discussed above.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 23rd day of December, 2021.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

34